Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH BARRY, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COUPANG, INC., BOM KIM, and GAURAV ANAND,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joseph Barry ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Coupang, Inc. ("Coupang" or the "Company"), analysts' reports and advisories about the Company, and other information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Coupang between August 6, 2025 and December 16, 2025, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. [1]

# JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Further, the Company maintains an office within this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

# PARTIES

6. Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

---

[1] Unless otherwise stated, all emphasis is added and internal citations are omitted.

7. Coupang describes itself, in pertinent part, as follows:

Coupang is one of the fastest-growing technology and commerce companies in the world, providing retail, restaurant delivery, video streaming, and fintech services to customers around the world under brands that include Coupang, Coupang Eats, Coupang Play and Farfetch.

8. Coupang has acknowledged that its primary market is South Korea. This action concerns Coupang's failure to disclose a material cybersecurity event (the "Breach," defined below), culminating in regulatory scrutiny and the resignation of the CEO of its South Korean subsidiary, Coupang Corp.

9. Coupang is incorporated in Delaware. Coupang maintains an office at 605 Fairchild Drive, Mountain View, California 94043.

10. Coupang common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "CPNG."

11. Defendant Bom Kim ("Kim") served as Chief Executive Officer and Chairman of Coupang's Board of Directors (the "Board") at all relevant times.

12. Defendant Gaurav Anand ("Anand") has served as Coupang's Chief Financial Officer ("CFO") at all relevant times.

13. Defendants Kim and Anand are sometimes referred to herein as the "Individual Defendants."

14. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

15. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

17. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**
**Materially False and Misleading Statements**
<u>**Issued During the Class Period**</u>

18. On August 5, 2025, after the market closed, Coupang filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2025 (the "Q2 2025 Report"). Attached to the Q2 2025 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Kim and Anand attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

19. The Q2 2025 Report incorporated by reference the Company's risk disclosures from its 2024 Annual Report, filed with the SEC on Form 10-K on February 25, 2025 (the "2024 Annual Report").

20. The 2024 Annual Report included the following risk disclosure:

> ***Any failure to protect our apps, websites, networks, and systems against security breaches or otherwise protect our and our customers' and business partners' confidential information could damage our reputation and brand and adversely affect our business, financial condition, and results of operations.***
>
> Our business employs websites, networks, and systems through which we collect, maintain, transmit, and store data about our customers, merchants, suppliers, advertisers, and others, including personally identifiable information, as well as other confidential and proprietary

Class Action Complaint for Violation of the Federal Securities Laws

information. *We rely on encryption and authentication technology in an effort to securely transmit confidential and sensitive information. However, security breaches or other security incidents have in the past resulted and could in the future result in the inadvertent or unauthorized use or disclosure of confidential and sensitive information we collect, store, or transmit, or otherwise enable third parties to gain unauthorized access to this information such as our inadvertent exposure of limited customer information within our App that occurred during an upgrade in 2021 and was remediated within an hour*. In addition, our apps, websites, networks, and systems are subject to security threats, including hacking of our systems, denial-of-service attacks, viruses, malicious software, ransomware, break-ins, phishing attacks, social engineering, security breaches, or other attacks and similar disruptions that may jeopardize the security of information stored in or transmitted by our apps, websites, networks, and systems, or that we otherwise maintain. Such risks extend not only to our own apps, websites, networks, and systems, but also to those of third-party services providers and our customers, contractors, business partners, vendors, and other third parties. Moreover, techniques used to obtain unauthorized access to or sabotage systems change frequently and are becoming increasingly sophisticated and may not be known until launched against us or our third-party service providers, increasing the difficulty of detecting and defending against such threats. We have observed an increase in the frequency of the security threats we and our third-party service providers face, and we expect these activities to continue to increase. Geopolitical tensions or conflicts, such as the conflict between Russia and Ukraine, and the increased adoption of artificial intelligence technologies, may further heighten the risk of cyber security incidents. In addition, security breaches can also occur as a result of non-technical issues, including intentional or inadvertent breaches by our employees or by persons with whom we have commercial relationships. As a result of any security breach, our reputation and brand could be damaged, our business could suffer, we could be required to expend significant capital and other resources to alleviate problems caused by such breaches, and we could be exposed to a risk of loss, litigation, or regulatory action and possible liability. Actual or anticipated attacks may cause us to incur increasing costs, including costs to deploy additional personnel and protection technologies, train employees, and engage third-party experts and consultants. Any compromise or breach of our security measures, or those of our third-party service providers, could violate applicable privacy, data security, and other laws, and cause significant legal and financial exposure, adverse publicity, and a loss of confidence in our security measures, which could have an adverse effect on our business, financial condition, and results of operations.

We are also subject to regulations relating to privacy and use of confidential information of our consumers, including, among others, Korea's Personal Information Protection Act and related legislation, regulations and orders (the "PIPA"), China's Personal Information Protection Act, the Act on the Promotion of Information and Communications Network Utilization and Protection of Information Act (Korea), and the Credit Information Act in Korea that specifically regulates certain sensitive personal information. PIPA requires consent by the consumer with respect to the use of his or her data and requires the persons responsible for management of personal data to take the necessary technological and managerial measures to prevent data breaches and, among other duties, to notify the Personal Information Protection Commission of any data breach incidents within 24 hours.

Class Action Complaint for Violation of the Federal Securities Laws

Failure to comply with PIPA in any manner may subject these persons responsible to personal liability for not obtaining such consent in an appropriate manner or for such breaches, including even negligent breaches, and violators face varying penalties ranging from monetary penalties to imprisonment. We strive to take the necessary technological and managerial measures to comply with PIPA, including the implementation of privacy policies concerning the collection, use, and disclosure of subscriber data on our apps and websites, and we regularly review and update our policies and practices. Despite these efforts to comply with PIPA, these rules are complex and evolving, subject to interpretation by government regulators which may change over time and therefore we are subject to the risk of claims by regulators of failure to comply with PIPA. *Any failure, or perceived failure, by us to comply with such policies, laws, regulations, and other legal obligations and regulatory guidance could adversely affect our reputation, brand, and business, and may result in claims, proceedings, or actions, including criminal proceedings, against us and certain of our executive officers by governmental entities or others or other liabilities*. *Any such claim, proceeding, or action, could hurt our reputation, brand, and business, force us to incur significant expenses in defense of such proceedings, distract our management, increase our costs of doing business, result in a loss of customers and merchants, and could have an adverse effect on our business, financial condition, and results of operations*.

21.  The statement in ¶ 20 was materially false and misleading at the time it was incorporated by reference into the Q2 2025 Report because it materially understated Coupang's risk of a material cybersecurity event such as a data breach, considering the extent to which Coupang's purported safeguards were woefully inadequate. Specifically, at the time the statement was made, a former Coupang employee (who had, inexplicably, retained access to Coupang's internal systems) had, for over a month, conducted an undetected breach of Coupang's internal systems with the intent to expose sensitive information about tens of millions of Coupang customers (the "Breach"). The Breach has been recognized as the most damaging data breach in South Korean history.

22.  On November 4, 2024, Coupang filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2025 (the "Q3 2025 Report"). Attached to the Q3 2025 Report were certifications pursuant to SOX signed by Defendants Kim and Anand attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

Class Action Complaint for Violation of the Federal Securities Laws

23. The Q3 2025 Report incorporated by reference the risk disclosures outlined in the 2024 Annual Report.

24. As discussed above, in ¶ 21, a risk disclosure regarding cyber security contained in the 2024 Annual Report was materially false and misleading at the time it was incorporated by reference in the Q2 2025 Report. It remained false and misleading at the time it was incorporated by reference in the Q3 2025 Report. By the time the Q3 2025 Report was filed with the SEC, the former employee who had retained access to Coupang's internal systems, had maintained unlawful access to Coupang customer information for nearly *six* months, demonstrating the material inadequacy of Coupang's cybersecurity defenses.

25. Item 1.05 of Form 8-K, "Material Cybersecurity Incidents", states as follows:

(a) ***If the registrant experiences a cybersecurity incident that is determined by the registrant to be material***, ***describe the material aspects of the nature, scope, and timing of the incident,*** and the material impact or reasonably likely material impact on the registrant, including its financial condition and results of operations.

(b) A registrant shall provide the information required by this Item in an Interactive Data File in accordance with Rule 405 of Regulation S-T and the EDGAR Filer Manual.

(c). Notwithstanding General Instruction B.1. to Form 8-K, ***if the United States Attorney General determines that disclosure required by paragraph (a) of this Item 1.05 poses a substantial risk to national security or public safety, and notifies the Commission of such determination in writing, the registrant may delay providing the disclosure required by this Item 1.05 for a time period specified by the Attorney General, up to 30 days following the date when the disclosure required by this Item 1.05 was otherwise required to be provided***. Disclosure may be delayed for an additional period of up to 30 days if the Attorney General determines that disclosure continues to pose a substantial risk to national security or public safety and notifies the Commission of such determination in writing. In extraordinary circumstances, disclosure may be delayed for a final additional period of up to 60 days if the Attorney General determines that disclosure continues to pose a substantial risk to national security and notifies the Commission of such determination in writing. Beyond the final 60-day delay under this paragraph, if the Attorney General indicates that further delay is necessary, the Commission will consider additional requests for delay and may grant such relief through Commission exemptive order.

26. Form 8-K includes the following instructions to Item 1.05
- A registrant's materiality determination regarding a cybersecurity incident must be made ***without unreasonable delay after discovery of the incident***.

Class Action Complaint for Violation of the Federal Securities Laws

- To the extent that the information called for in Item 1.05(a) is not determined or is unavailable at the time of the required filing, the registrant shall include a statement to this effect in the filing and then must file an amendment to its Form 8-K filing under this Item 1.05 *containing such information within four business days after the registrant, without unreasonable delay, determines such information or within four business days after such information becomes available*.
- The definition of the term "cybersecurity incident" in §229.106(a) [Item 106(a) of Regulation S-K] applies to this Item.
- A registrant need not disclose specific or technical information about its planned response to the incident or its cybersecurity systems, related networks and devices, or potential system vulnerabilities in such detail as would impede the registrant's response or remediation of the incident.

27. On November 18, 2025, Coupang discovered that the Breach had occurred, which it ultimately discovered had led to the exposure of personal information of over 33 million of its customers, which is reportedly the largest data breach in South Korean history. The leaked information included customer names, email addresses, and delivery addresses. This leak has resulted in material legal exposure in South Korea, Coupang's primary market.

28. Upon information and belief, Coupang did not receive a filing exemption from the Attorney General of the United States to exempt it from reporting the Breach on Form 8-K.

29. Coupang did not disclose the information in a Form 8-K by November 24, 2025, four business days after November 18, 2025 (not including November 18, 2025). It did not even do so after media coverage of the Breach.

30. The statements referenced in ¶¶ 20, 23, 27 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Coupang had inadequate cybersecurity protocols that allowed a former employee to access sensitive customer information for nearly six months without being detected; (2) this subjected Coupang to a materially heightened risk of regulatory and legal scrutiny; (3) When Defendants became aware that Coupang had been subjected to this data breach, they did not report it in a current report filing (to be filed with the U.S. Securities and Exchange Commission (the "SEC")) in compliance with

applicable reporting rules; and (4) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

31. On Sunday November 30, 2025, Reuters published an article entitled "Top South Korean e-commerce firm Coupang apologises over massive data breach."

32. The article stated that Coupang had "apologised on Sunday over the breach of personal information from 33.7 million customer accounts through unauthorized data access."

33. The article further stated that "[t]he government, **which held an emergency meeting on Sunday, is looking into whether Coupang violated safety rules** regarding personal information protection, said Minister of Science and ICT Bae Kyung-hoon."

34. On December 1, 2025, before the market opened, *Bloomberg* published an article entitled "Massive Coupang Data Leak Caps Record Year for Cyber Breaches."

35. The article stated that "[a] massive data breach at [Coupang] caps what is set to be a record year for online leaks in the country, highlighting weaknesses in Seoul's cyber defenses."

36. The article further stated that "**local media reported that a former Coupang employee could have exploited a system vulnerability.** Officials warned that the compromised information could be used to carry out targeted phishing attacks."

37. Further, it stated that "Korean newspapers splashed the story across front pages [. . .] as worries mounted over possible disruptions following the breach. With nearly 25 million active users, many Korean families rely on the Amazon-like retailer for the bulk of their shopping, *typically handling over sensitive information like apartment door codes to facilitate deliveries*."

38. On this news, Coupang stock fell $1.51 per share, or 5.36%, to close at $26.65 on December 1, 2025.

39. On Wednesday, December 10, 2025, *The New York Times* published an article entitled "C.E.O. Resigns in Fallout Over Massive South Korean Data Breach." It stated, in part, the following:

> ***The head of the South Korean unit of the e-commerce company Coupang resigned on Wednesday***, as the fallout from a data breach affecting nearly 34 million users of the online shopping site intensifies.
>
> Park Dae-jun, who became the sole chief executive of Coupang's business in South Korea earlier this year, ***said in a statement released by the company that he was resigning to accept "grave responsibility" over the data leak***, which was announced last month. Coupang is headquartered in Seattle, but nearly all of its revenue comes from South Korea, ***where it is as ubiquitous as Amazon is in the United States***.
>
> Coupang first detected a data breach on Nov. 18 that exposed the personal information of roughly 4,500 customers. It issued another statement on Nov. 29, ***saying that a follow-up investigation found that information on 33.7 million customer accounts — nearly its entire user base — had been exposed.*** This leak included customers' names, email addresses and delivery addresses. The exposed information did not include payment or login details, Coupang said.

40.     The New York Times article stated the following regarding legal and regulatory consequences facing Coupang:

> Earlier on Wednesday, ***South Korean police investigating the breach raided Coupang's offices in Seoul for a second straight day***. ***Executives were summoned to appear at a hearing to take place next week at South Korea's legislature***, the National Assembly.

41.     On this news, Coupang stock fell $0.87 per share, or 3.2%, to close at $26.06 on December 10, 2025.

42.     On Sunday, December 14, 2025, Bloomberg published an article entitled "Billionaire Coupang Founder Rejects Summons to Data Leak Hearing."

43.     The article stated that Defendant Kim had "told South Korean lawmakers he won't attend this week's parliamentary hearing ***on the country's largest-ever data breach***, blaming his busy schedule."  The article also stated that two executives who had resigned due to the Breach (including Park Dae-jun) had also "notified lawmakers that they would not attend after they were summoned by the committee."

44.     The article discussed how this action had incensed South Korean lawmakers, signaling further legal exposure for Coupang. It stated, in part, as follows:

> The parliamentary committee rejected the executives' refusal to attend and described the move as a 'systematic evasion of corporate responsibility' that betrays public trust. ***The committee will push for legislation to prevent corporate executives from behaving in this matter, it said in a statement***.

45. The article referenced how Choi Min-hee, who "heads a parliamentary committee for science, ICT, and broadcasting" had said that "Coupang may attempt to flee beyond the nation's borders, but its responsibility cannot escape those borders[.]"

46. On December 15, 2025, The Korea Times published an article entitled "Coupang data breach fuels calls to expand class action lawsuits." The article discussed potential legal reforms in South Korea specifically due to widespread public anger over the Breach.

47. The article stated that the President of South Korea, Lee Jae Myung, had urged the "swift" introduction of a class action system in response to the Breach, and quoted President Lee as stating that "[e]very Korean has been affected. It makes no sense to ask each victim to file an individual lawsuit[.]" Further, it stated that "[h]is comments *came as public anger mounted over the leak of personal information belonging to 33.7 million Coupang users* — roughly two-thirds of Korea's population of 51.7 million."

48. On December 15, 2025, beinsure published an article entitled "Coupang data breach traced to ex-employee with system access." The article stated that the Breach had been "traced to a *former* employee who *retained access* to internal systems *after leaving [Coupang]*, according to South Korean police."

49. The article further stated the following:

As the investigation [of the Breach] progressed, police identified the primary suspect as a 43-year-old Chinese national who previously worked at Coupang.

According to JoongAng Daily, the man joined the company in November 2022 and was assigned to authentication management systems. *He left the firm in 2024 but allegedly retained access credentials*. Authorities believe he has already left South Korea.

Investigators said Coupang is currently treated as the victim in the case*. Still, they warned that if negligence or legal violations emerge, the company and staff responsible for safeguarding customer data could face liability*.

50. On this news, Coupang stock fell $1.30 per share, or 5.07%, to close at $24.33 on December 15, 2025. Coupang stock fell a further $1.14 per share, or 4.68%, to close at $23.19 on December 16, 2025.

51. On December 16, 2025, after the market closed, Defendants finally filed an 8-K acknowledging the Breach, which they acknowledged was pursuant to Item 1.05 of Form 8-K, as discussed above. The 8-K stated the following:

> On November 18, 2025, Coupang Corp. ("Coupang Corp."), a wholly-owned Korean subsidiary of Coupang, Inc. (Coupang Corp., together with Coupang, Inc. ("Coupang, Inc.," "our," or "we") and its subsidiaries and affiliates, "Coupang,")), became aware of a cybersecurity incident involving unauthorized access to customer accounts (the "Incident"). Upon discovery, Coupang activated its incident response processes, disabled the threat actor's unauthorized access, reported the Incident to the relevant Korean regulatory and law enforcement authorities, and warned customers whose data was potentially accessed.
>
> Based on investigative findings, Coupang has determined that a former employee may have obtained the name, phone number, delivery address, and email address associated with up to 33 million customer accounts, and certain order histories for a subset of the impacted accounts. To Coupang's knowledge, the former employee has not publicly disclosed the obtained data. No Coupang customers' banking information, payment card information, or login credentials were obtained or otherwise compromised in the Incident. Coupang is continuing its investigation and has engaged external forensic experts to assist with the investigation. Korean regulators have initiated investigations with which Coupang is fully cooperating. While one or more Korean regulators will potentially impose financial penalties, at this time we cannot reasonably estimate any amount of losses or range of losses that may result from such penalties.
>
> Coupang's operations have not been materially disrupted. Coupang remains subject to various risks due to the Incident, including diversion of management's attention and potentially material financial losses resulting from the potential loss of revenue and potential higher expenses, including from remediation, regulatory penalties, and litigation.
>
> The former chief executive officer of Coupang Corp., our Korean subsidiary, resigned on December 10, 2025, and Harold L. Rogers, General Counsel and Chief Administrative Officer of Coupang, Inc., is serving as interim chief executive officer of the Korean subsidiary.

52. On this news, Coupang stock fell $0.47 per share, or 2.02%, to close at $22.72 on December 17, 2025.

53. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

54. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of the Company during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

55. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

56. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

57. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

59. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

60. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- the Company's securities are traded in efficient markets;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ, and was covered by multiple analysts;

- • the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- • Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

61. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

62. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

63. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

65. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- • employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

67. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

68. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

69. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially

inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

70.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

71.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

72.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

73.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

74.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

75.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

76.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period.

Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

77. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

78. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

| | |
|---|---|
| Date: December 18, 2025 | Respectfully submitted,<br><br>**THE ROSEN LAW FIRM, P.A.**<br>/s/ Laurence M. Rosen<br>Laurence M. Rosen, Esq. (SBN 219683)<br>355 South Grand Avenue, Suite 2450<br>Los Angeles, CA 90071<br>Telephone: (213) 785-2610<br>Facsimile: (213) 226-4684<br>Email: lrosen@rosenlegal.com<br><br>*Counsel for Plaintiff* |

Class Action Complaint for Violation of the Federal Securities Laws